IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MITCHELL INTERNATIONAL, INC., et als., <br><br> Plaintiffs, <br><br> v. <br><br> LUIS ARMANDO RODRIGUEZ FRATICELLI, et als., <br><br> Defendants. | **CIVIL NO. 03-1031 (GAG/BJM)** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**INTRODUCTION**

Plaintiffs Mitchell International, Inc. ("Mitchell") and ABC Infotech, Inc. ("Infotech") filed a complaint for damages and injunctive relief alleging copyright infringement under the Copyright Act of 1976 ("Copyright Act"), as amended, 17 U.S.C. §1, *et seq.*, unfair competition under the Lanham Trademark Act ("Lanham Act"), 15 U.S.C. §1125(a), as well as claims for tort, unfair competition, and unjust enrichment under Puerto Rico law. The parties have consented to the jurisdiction of a magistrate judge, and the case was referred to me for all further proceedings and entry of judgment pursuant to 28 U.S.C. §636(c).

The parties waived their right to trial by jury, and a non-jury trial was held in September 2007. The court heard testimony from Jose Marrero-Gotay, Carlos Martínez-Gorbea, Zoilo García-Rivera (owner of plaintiff Infotech), defendant Luis A. Rodríguez-Fraticelli, and Angel Camacho. Numerous exhibits were admitted into evidence. (See Docket No. 150, 151). The parties also stipulated certain uncontested facts prior to trial (Docket No. 38, p. 31-33) which the court read into the record. At the close of plaintiff's case, and at the close of all evidence, the defendant moved for dismissal of all causes of action (Docket No. 148), and that motion is pending before the court along with plaintiffs' request for equitable and monetary relief. Based on the evidence and arguments submitted, the court makes the following findings of fact and conclusions of law.

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 2
**Civil No. 03-1031 (GAG/BJM)**

## FINDINGS OF FACT

1. Plaintiff Mitchell is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Diego, California. Mitchell is a leader in the development, marketing and distribution of computer software programs for use by the auto collision repair and property and casualty insurance industries.

2. Co-plaintiff Infotech is a corporation with offices and operations in Puerto Rico, presided by Mr. Zoilo Garcia. Since 1991, Mitchell has been exclusively represented in Puerto Rico by Infotech by virtue of a Country Management Agreement, which permits Infotech to represent Mitchell in Puerto Rico for sales, support and other related matters.

3. Mitchell authored and owns the copyright and trademark to the UltraMate software programs. Mitchell's UltraMate and ImageMate programs are protected by federal copyright laws, trademark laws and regulations.

4. Since 1995, Mitchell and Infotech have marketed the software known as UltraMate, Puerto Rico version, for estimating automobile collision related damages as well as other related software like ImageMate, a digital photo imaging solution for auto physical damage digital photo documentation.

5. The UltraMate software includes comprehensive databases of vehicle configurations, collision parts, and parts replacement labor time, as well as Puerto Rico specific suggested retail prices for current vehicle makes and models. Additionally, it incorporates sophisticated algorithms to accurately calculate the dollar value of the damages.

6. Since its inception in the market, UltraMate Puerto Rico has become the standard benchmark of the industry with an estimated market share of electronic estimating in Puerto Rico of above ninety percent (90%).

7. Mitchell and Infotech have invested substantial amounts of time and money in development, maintenance, training and marketing of Mitchell's software programs in Puerto Rico.

8. In order for an auto body repair shop to obtain and use Mitchell's software programs,

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 3
**Civil No. 03-1031 (GAG/BJM)**

the business or shop owner must obtain from Mitchell, through Infotech, a copy of the programs after entering into a subscription contract known as an "End User Agreement." The licensed copy is delivered to the customer on a CD-ROM, which is loaded by an Infotech representative into the customer's personal computer hard disk. The customer is also given a User's Guide, which is part of the kit the customer licenses from plaintiffs. Infotech employees inform the user of the terms of the End User's Agreement.

9. The End User Agreement contains a paragraph stating that the user "acknowledges that the Licensed Software and Database comprises information which constitutes a trade secret of Mitchell" and "agrees that no portion of the information constituting the Licensed Software and Database may be disclosed to others, copied, reproduced, compiled, interfaced with any systems or used for any purpose or purposes other than as specifically contemplated by this Agreement."

10. Mitchell, through Infotech, charges $750.00 to a new customer for the installation and training of the UltraMate program and $450.00 for the installation and training of the ImageMate program. Thereafter the customer pays on the average $330.00 a month for the use of the UltraMate program and receives revised updates of the program every month, as it is a subscription based product. The ImageMate is a purchase based product, most commonly acquired on a thirty-six month installment payment plan, which on average pays approximately $99.00 per month, including telephone support fees.

11. Mitchell sends an updated version of the UltraMate program to its subscribers every month. The UltraMate program has a 60 or 90 day security time out period, which is intended to impede the use of the most current CD-ROM after 60 or 90 days. This feature is designed to protect Mitchell from illegal use of its programs by a customer that has ceased to be provided with CD-ROMs as a result of non-payment of the account and/or non-renewal of an expired contract. However, illegal use of the program can be made beyond the 60 or 90 day period by back dating the shop's computer and/or by copying data from an updated CD.

12. In 1996, Infotech had approximately 100 users of the UltraMate program in Puerto

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  **Page 4**
**Civil No. 03-1031 (GAG/BJM)**

Rico. This number rose to at least 280 by the end of 2001.

13.     Since 1998, plaintiffs encountered sporadic illegal usage of the Mitchell software in Puerto Rico. In response, Infotech would visit the offending establishments, explain the illegal conduct and attempt to convince the owner to enter into an End User License Agreement.

14.     Defendant Luis Rodríguez worked at NAPA Auto Parts from 1990 to 1992 where he gained experience using Mitchell's manuals. Rodríguez worked at Infotech from 1993 to 1994 as a commissioned salesman selling Mitchell's manuals in Puerto Rico. He left Infotech in 1994 but returned that same year as a regular employee.

15.     Rodríguez left Infotech again in 1997 to work for three months with an insurance company using the UltraMate program. During this time, Rodríguez subscribed to the UltraMate program and had executed an End User Agreement that contained specific restrictions against the unauthorized use of the program. Rodríguez's End User Agreement lapsed after twelve months due to his failure to make payments.

16.     Rodríguez returned to Infotech in 1997 to work as a trainer on the use of UltraMate. He received training from Mitchell in the UltraMate software and manuals, and himself gave training in the UltraMate program to personnel of the compulsory auto insurance program in Puerto Rico. As part of his duties for Infotech, Rodríguez would visit auto body shops believed to be making illegal use of the UltraMate program and would try to resolve the situation by getting the body shop to negotiate an End User Agreement with Mitchell.

17.     Rodríguez again left Infotech in November 1998 to develop his own business, but remained available to perform sales and service for Infotech as needed. He returned again to work at Infotech around May 1999 and served as Infotech's principal trainer in the UltraMate software. He would conduct three-day trainings of new clients. When requested, he would have the End User Agreement translated into Spanish for a client. He was aware that the UltraMate software was protected by copyright and trademark law, and he would explain to customers that they needed a valid license to install the Mitchell programs. He stayed with Infotech until his final resignation on April 11, 2001.

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 5
**Civil No. 03-1031 (GAG/BJM)**

18. While at Infotech, Rodríguez had access to the databases, client lists and training manuals; these materials were subject of a confidentiality agreement.

19. After leaving Infotech, Rodríguez worked for Advanced Body Shop ("Advanced") as an estimator using the UltraMate program. He would deliver estimates printed on the form generated by UltraMate; that form indicated that it was protected by copyright and trademark. Advanced was an Infotech customer. Rodríguez had permission from Advanced to do these estimates. He left Advanced in late 2001.

20. After leaving Infotech, Rodríguez also started giving trainings on his own in the UltraMate program to body shops that were on a list he had prepared of 231 Infotech clients before he resigned. He charged $150.00 per auto shop for the training services. For this purpose, Rodríguez developed a Spanish language manual using the UltraMate system, User Guide, forms and graphics. He had not obtained permission from Mitchell to use the graphics and other material in his manual. He also used the UltraMate program in performing these trainings.

21. Some time after Rodríguez resigned from Infotech, Infotech's owner, Zoilo Garcia, encountered him performing a training in UltraMate using Infotech's printed training materials. Garcia demanded that Rodríguez return the materials or face legal problems. Rodríguez first agreed to return the materials, and later told Garcia that he had destroyed them.

22. In late 2001, Garcia heard rumors that Rodríguez had offered to sell copies of the UltraMate program to a body shop owner for $150.00. As a result, Mitchell retained the services of an attorney and of Consultant and Resources International ("CRI") to investigate evidence of infringement of the UltraMate program.

23. CRI proceeded to obtain sample auto body damage estimates from approximately 100 auto body shops that were suspected of illegal use of the UltraMate program. Of these, many auto body shops that were not authorized to use UltraMate delivered printed estimates that were generated by the UltraMate program and which contained copyright and trademark notices.

24. On June 21, 2002, Mitchell and Infotech filed an initial lawsuit against fifteen of these body shops, with the complaint captioned as *Mitchell International*, *et als. v. Nino Rosa Rivera, et*

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 6
**Civil No. 03-1031 (GAG/BJM)**

*als*, Civil No. 02-1955 (PG) ("*Mitchell I*"). After filing this complaint, Mitchell sent cease and desist letters to 28 other shops deemed to have infringed the copyright of the UltraMate program. Many recipients of these letters agreed to settle and/or legalize their use of UltraMate. Those that did not were sued in a second lawsuit, captioned as *Mitchell International, Inc. v. Regal González, et als.,* Civil No. 04-2279 (PG).

25.  Pursuant to a seizure order issued in *Mitchell I*, plaintiffs visited defendant auto body shops, inspected the computers, and seized computers from fifteen businesses found to have the UltraMate program installed. The seized computers were examined by plaintiffs' consultant, GHTEK Consulting.

26.  Rodríguez was served with a summons and the complaint in the present case in February 2003.

27.  In May 2003, GHTEK Consulting inspected Rodríguez's personal laptop computer as part of the present case. The inspection revealed that the computer's files contained 402 estimates made with the UltraMate program. The date of the first estimate was August 14, 2000, and the date of the last estimate was May 10, 2003. The highest number for an estimate was 549 - indicating that that was the actual number of estimates performed on the computer using the UltraMate program. All estimates with numbers 39 and higher were generated after January 1 of 2002. Rodríguez was not licensed to use the UltraMate program during these years.

28.  Rodríguez charged approximately $20.00 per estimate. Consequently, he earned approximately $10,200.00 performing these unauthorized estimates after January 1, 2002.

29.  The inspection also revealed an Excel file containing statements for every month from January 2002 through April 2003. These statements indicate the name, location and telephone number of clients served by Rodríguez, as well as money received during each month from each client and balances pending. Rodríguez testified that by January 2002 he had contacted at least 31 businesses to offer his services in updating their UltraMate programs. Most if not all of these businesses were former or present clients of the plaintiffs.

30.  By approximately late 2001, plaintiffs experienced an increase in customers who

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 7
**Civil No. 03-1031 (GAG/BJM)**

wanted out of their End User License Agreements and/or who stopped making payments on their subscriptions to UltraMate. Many of these subscribers were those who were contacted by Rodríguez. Mitchell received letters from some its customers in Puerto Rico seeking suspension of their UltraMate service from Mitchell. Rodríguez admitted that he had advised some of Mitchell's customers to send these letters.

31.  Rodríguez testified that the amounts indicated in the Excel file in his computer corresponded to fees he charged these clients for installing the UltraMate program at businesses that did not have the program, or installing updates of the UltraMate program for those businesses that already had a prior version of the program. Rodríguez admitted installing the UltraMate program at approximately 18 businesses, and installing updated versions of the program at approximately 40 businesses. He would do this by taking an updated UltraMate CD and copying it into the clients' computer hard drive; once installed, he would take the CD with him when he left.[1] He charged these businesses $150 per visit to install updated versions of UltraMate.

32.  Rodríguez did not have authorization from Mitchell or Infotech to install or update the UltraMate program at these businesses during the time period reflected in the Excel program monthly statements.

33.  Plaintiffs' clients who were current in their accounts did not need to have Infotech visit them monthly to install updates because the updated CDs would be mailed directly to the businesses from Mitchell.

34.   According to the Excel files recovered from his computer, Rodríguez received a total of $46,145.00 for installing updates of the UltraMate program to various auto shops from January 2002 through April 2003. Based on this number, Rodríguez performed approximately 307 unauthorized monthly updates of the UltraMate Program for which he charged $150.00 each.

35.  If plaintiffs would have received their monthly fee of $330.00 for these 307 updates, they would have earned $101,310.00.

---

[1] When testifying at trial, Rodríguez pointedly refused to reveal where he obtained the CDs of the UltraMate program that he installed in the businesses he visited.

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  **Page 8**
**Civil No. 03-1031 (GAG/BJM)**

      36.    Rodríguez installed UltraMate at eighteen businesses that were never clients of Mitchell or Infotech. If these businesses would have purchased the software from Mitchell for the installation fee of $750.00 each, Mitchell would have received an additional $13,500.00 in initial installation fees.

      37.    After Rodríguez's computer was audited in the present case in May 2003, he continued to install unauthorized UltraMate updates in businesses until approximately October 2003.

      38.    Rodríguez admitted that not all of the money he received for installing the UltraMate program after January 2002 is reflected in the Excel files on his computer.

      39.    In approximately June 2002, one of the defendants in *Mitchell I* informed Rodríguez that its computer had been seized and told him the identity of the defendants in that lawsuit. About the same time, the money Rodríguez collected for installing and updating the UltraMate program dropped from $7,770.00 in June 2002 to $475 in July 2002. In August of 2002 it rose again to $1,650.00.

      40.    Rodríguez was also contacted by some of the businesses who received cease and desist letters following the filing of *Mitchell I*. Nevertheless, he continued to install updates of the UltraMate program to some of those clients.

      41.    Rodríguez received an opinion and order issued in the case of *Mitchell I* in which the court held it was illegal for the auto body shops to use the UltraMate program without authorization. Rodríguez discussed the opinion with a person of confidence, but subsequently continued to provide updates of the program to unauthorized users.

      42.    When Rodríguez visited auto body shops to install or update the UltraMate program, he used a vehicle with no indication of the name of his business. He would go dressed casually or with a shirt that had the name Puerto Rico Estimate Solutions. He also at times showed them a business card he designed with the name LR Consulting Support.

      43.    Plaintiffs have incurred the following expenses in connection with their investigation of Rodríguez's conduct and in the prosecution of this lawsuit:

      a.    $225.00 paid to GHTEK consulting for the audit of Rodríguez's computer;

  b.  $21,000.00 in legal fees paid to Dennis A. Simonpietri, Esq.;

  c.  $770.45 in attorney's expenses;

  d.  $3,975.00 in legal fees paid to Carlos Rodríguez Quesada, Esq.;

  e.  $3,684.00 paid to CRI for investigation services;

  f.  $3,172.00 for deposition transcripts;

  g.  $470.00 for document production;

  h.  $130.00 for process servers.

## CONCLUSIONS OF LAW

**A. Subject Matter Jurisdiction**

Subject matter jurisdiction is based on the existence of a federal question pursuant to 28 U.S.C. §1331 and §1338. This court has supplemental jurisdiction to decide claims based on Puerto Rico law pursuant to 28 U.S.C. §1367.

**B. The Copyright Infringement Claim**

  **1. *Infringement***

Section 106 of the Copyright Act gives the owner of a copyright the exclusive right, *inter alia*, "(1) to reproduce the copyrighted work in copies...; (2) to prepare derivative works based upon the copyrighted work; [and] (3) to distribute copies... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. §106.

The owner of a valid copyright "enjoys exclusive rights to reproduce all or any part of the copyrighted work, prepare a work derivative of it, distribute copies of it, perform or display it, and authorize others to exercise any of these rights." Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005), *citing* 17 U.S.C. § 106. "One who violates any of these exclusive rights is an infringer of the copyright, and the legal or beneficial owner of the copyright ... may institute an action for infringement against him." Johnson, 409 F.3d at 17, *citing* 17 U.S.C. § 501. It is irrelevant whether the infringement was knowingly or innocently since "copyright infringement does not have a scienter requirement." Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 537 (6th Cir. 2004), *citing* Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997).

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 10
**Civil No. 03-1031 (GAG/BJM)**

"To establish copyright infringement under the Copyright Act, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Johnson, 409 F.3d at 17, *quoting* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); see also, Accusoft Corp. v. Palo, 923 F.Supp. 290 (D.Mass. 1996). The plaintiff bears the burden of proof as to both elements. Grubb v. KMS Patriots, L.P., 88 F.3d 1, 3, 5 (1st Cir.1996).

Registration with the U.S. Copyright Office is *prima facie* evidence of copyright ownership, and shifts the burden to the adverse party to demonstrate why the copyright is not valid. Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807, 813 (1st Cir. 1995).

In this case, Mitchell has established *prima facie* evidence that it owns a valid copyright in the UltraMate software programs through the testimony of Zoilo Garcia and by producing evidence of registration with the U.S. Copyright Office. Defendant has produced no evidence to demonstrate why Mitchell's claimed copyright is not valid, and in fact stipulated in the joint proposed pretrial order that the UltraMate program is protected by federal copyright laws. Accordingly, I find that Mitchell has established ownership of a valid copyright and has satisfied the first prong.

With respect to the second prong, "a plaintiff must first prove that the alleged infringer copied plaintiff's copyrighted work as a factual matter; to do this, he or she may either present direct evidence of factual copying or, if that is unavailable, evidence that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying (i.e., probative similarity)." Lotus Dev. Corp., 49 F.3d at 813.

In the present case, the evidence of unauthorized factual copying is overwhelming. Defendant Rodríguez admitted during his testimony that starting not later than January 2002 and extending beyond May 2003, and without authorization or permission from the plaintiffs, he copied the contents of CDs of the UltraMate program into the hard drives of numerous auto body businesses, and that he received $150.00 per visit for this service. The evidence further establishes that during that same time period Rodríguez used the UltraMate program without a license or

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 11
**Civil No. 03-1031 (GAG/BJM)**

authorization to perform auto damage estimates and to conduct trainings as to the use of the program. Again, Rodríguez was compensated for performing these services. Given Rodríguez's admissions and the other evidence on record, plaintiffs have established beyond peradventure that Rodríguez infringed Mitchell's exclusive rights to reproduce and distribute the UltraMate program.

### 2. *Damages*

Section 504(b) of the Copyright Act provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. §504(b).

As an alternative to an award of actual damages and profits set forth above, section 504(c)(1) of the Copyright Act gives to the plaintiff the right to "elect, at any time before final judgment is rendered, to recover... an award of statutory damages for all infringements involved in the action, with respect to any one work... in a sum of not less than $750 or more than $30,000 as the court considers just."  17 U.S.C. §504(c)(1).  However, under section 504(c)(2), the court has the discretion to award as much as $150,000 upon determining that the infringement was committed "willfully."  But where the infringer sustains the burden of proving that he was not aware and had no reason to believe that his acts constituted infringement of copyright, the court may reduce the statutory damages to an amount not less than $200.  17 U.S.C. §504(c)(2).

In this case, Mitchell has elected to receive statutory damages in lieu of an award of its actual damages and defendant's profits. (Docket No. 57).  Mitchell further requests a finding that Rodríguez committed "willful" infringement under the Copyright Act, and that consequently the statutory damages should be enhanced up to the statutory maximum of $150,000.

Plaintiffs have amply demonstrated that Rodríguez's infringement of UltraMate was "willful" within the meaning of the Copyright Act.  "Willful," under the statute, means "with knowledge that

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**   Page 12
**Civil No. 03-1031 (GAG/BJM)**

the defendant's conduct constitutes copyright infringement." Danjaq LLC v. Sony Corp., 263 F.3d 942, 957 (9th Cir. 2001); see also Princeton Univ. Press v. Mich. Doc. Serv., Inc., 99 F.3d 1381, 1392 (6th Cir. 1996); MCA Television Ltd. v. Feltner, 89 F.3d 766, 768 (11th Cir. 1996); RCA/Ariola Intern., Inc. v. Thomas & Grayston Co., 845 F.2d 773, 779 (8th Cir. 1988).

Here, the evidence shows that Rodríguez was well aware that his conduct constituted infringement. Rodríguez had extensive experience selling, using, and training in the UltraMate program for Infotech and others from 1993 to April 2001. His specific duties with Infotech included confronting auto body shops who were making illegal use of the UltraMate program and getting them to enter into an End User Agreement. Rodríguez himself subscribed to the program in 1997 and executed an end User Agreement, the terms of which specifically prohibited the unlicensed use and copying of the UltraMate program. Moreover, the printouts of damages estimates generated by the program clearly indicate that the program is subject to copyright protection. Finally, Rodríguez continued to distribute and copy UltraMate without authorization even after Zoilo found him giving unauthorized trainings and threatened legal action, after Rodriguez was served with the present lawsuit, and after he had been notified of the court's determination in *Mitchell I* that the unauthorized use by the defendants in that case constituted illegal infringement. Against this avalanche of evidence, Rodríguez's testimony that he did not know his conduct was illegal is simply not credible.

Having found that Rodríguez engaged in willful infringement, the question of the amount of the statutory damages remains. The district court has broad discretion in determining the amount of statutory damages in a copyright infringement case. Venegas-Hernández v. Sonolux Records, 370 F.3d 183 (1st Cir. 2004); Video Views, Inc.v. Studio 21, Ltd., 925 F.2d 1010 (7th Cir. 1991). However, the amount of statutory damages should be sufficiently high to deter future infringement. Int'l Korwin Corp. v. Kowalczyk, 665 F.Supp. 652 (N.D. Ill. 1987). Moreover, although the plaintiff requesting statutory damages does not have to prove its own actual damages or the amount the infringer profited from his conduct, courts have considered these amounts when awarding statutory damages in a case. See, e.g., Webloyalty.com v. Consumer Innovations, LLC, 388 F.Supp. 2d 435 (D.Del. 2005).

In this case, Rodríguez derived considerable profits from his infringement of Mitchell's copyrights. The evidence establishes that Rodríguez performed approximately 307 unauthorized installations of updated UltraMate programs, for which he received $150 each for a total of in excess of $46,000. In addition, Rodríguez performed at least 510 unauthorized estimates with the UlraMate program after January 2002, for which he received approximately $20 each, or a total of $10,200. Plaintiffs have also established that Rodríguez's illegal initial installation of the Mitchell program to eighteen auto body shops cost plaintiffs $13,500 in lost initial installation fees (of $750 each). Plaintiffs further lost the difference between what they would have charged for installing 307 monthly updates ($330 each) and what Rodríguez charged for those updates ($150), an amount which totals $55,260 (307 x $180).

In the end, Rodríguez's willful infringement resulted in profits to him and damages to plaintiffs totaling in excess of $124,960.[2] Given the extent defendant's infringement activities, I find that an award of $150,000 in statutory damages is warranted in this case to deter future infringing conduct.

### 3. *Request for permanent injunction*

Section 502 of the Copyright Act provides that the court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. §502(a). Final injunctions are usually granted when there is a finding of past infringement and a substantial likelihood of continued infringement. Pacific and Southern Co., Inc. v. Duncan, 744 F.2d 1490 (11th Cir. 1984); Pedrosillo Music, Inc. v. Radio Musical, Inc., 815 F.Supp. 511, 516 (D.P.R. 1993); CMAX/Cleveland, Inc. v. UCR, Inc., 804 F.Supp. 337 (M.D. Ga. 1992).

In this case, Mitchell has established the threat of continued violations of its copyright absent injunctive relief. In particular, the evidence at trial established that Rodríguez continued to violate Mitchell's copyright even after he received notice of the district court's decision is *Mitchell I*

---

[2] This is actually a conservative estimate, insofar as it does not take into account profits and damages related Rodriguez's installation of the UltraMate program after May 2003.

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 14
**Civil No. 03-1031 (GAG/BJM)**

determining the illegality of the unauthorized use of the UltraMate program by the defendant body shops in that case. Rodríguez further continued to violate Mitchell's copyright even after the present lawsuit was filed and after his own computer was audited as part of that lawsuit. Accordingly, the court permanently enjoins Rodríguez from infringing or assisting any other person in infringing Mitchell's copyrights in its UltraMate software programs.

### 4. *Impoundment of Infringing Articles*

Section 503 of the Copyright Act provides that "[a]s part of the final judgment or decree, the court may order the destruction or other reasonable disposition of all copies... found to have been made or used in violation of the copyright owner's exclusive rights." 17 U.S.C. §503(b). Plaintiffs request an order directing the United States Marshals Service to impound any computers in defendant's possession shown to have used the UltraMate program.

As indicated above, the record demonstrates that Rodríguez continued to infringe Mitchell's copyrights in the UltraMate program even after receiving substantial notice as to the illegality of his actions. An order of impoundment is therefore warranted in this case, and the court orders that within ten working days of entry of judgment Rodríguez submit all of his computers to inspection by Mitchell's experts to determine whether they contain any of Mitchell's copyrighted programs and materials; if so found, such programs and materials will be deleted from the computers' hard drives. By the same date, defendant shall deliver to plaintiffs' representatives any and all CDs, manuals or material that contain copies of, or were derived from, Mitchell's copyrighted programs and materials. Notwithstanding the foregoing, Mitchell and its experts shall ensure that any inspection and examination of defendants' computers shall be limited to a search for the existence of Mitchell's copyrighted programs and materials; no inspection or examination of other files shall be made.

### 5. *Request for Costs and Attorneys Fees*

Plaintiffs seek to recover $26,637.50 in attorneys fees in the present case and $4,177.00 for costs associated with the taking depositions, service of process, reproduction of documents and bank records. Plaintiffs further seeks recovery of $3,975.00 in legal fees paid to an attorney retained to represent them in bankruptcy proceeding initiated by plaintiff, arguing that such services were

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 15
**Civil No. 03-1031 (GAG/BJM)**

necessary to preserve plaintiffs' claim and to lift the automatic stay so that the present case could proceed. In support of this request, Mitchell produced at trial copies of time sheets submitted by its attorneys and invoices as to various costs.

Costs and reasonable attorneys fees may be awarded to the prevailing party under section 505 of the Copyright Act. "'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994), *quoting* Hensley v. Eckerhart, 461 U.S. 424, 436-37 (1983). Such factors to be considered include "'frivolousness, motivation, objective unreasonableness (both in the factual and the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" Id. at 534 n.19, *quoting* Lieb v. Topstone Industries, Inc., 788 F.2d 151, 156 (3d Cir. 1986).

The court has reviewed the submitted evidence as well as the docket in this case that stretches back for four years. Based on the evidence, the complexity of this case, the recalcitrance of the defendant, and the need to promote the underlying purposes of the Copyright Act, the court finds that an award of $21,000.00 in attorneys fees to plaintiffs in the prosecution of the present case, plus $3,975.00 in legal fees paid to plaintiffs' bankruptcy attorney, is reasonable in this case. The court further awards costs in the amount of $4,177.00.

    **C.**    **The Lanham Act Claim**

Plaintiffs also claim that Rodríguez's conduct violated section 43(a) of the Lanham Act. 15 U.S.C. §1125. Section 43(a) provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 16
**Civil No. 03-1031 (GAG/BJM)**

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a).

As far as the court can tell, plaintiffs' Lanham Act claims are based on (1) Rodríguez's alleged misrepresentation that his services were affiliated or associated with Infotech and/or Mitchell; (2) alleged misrepresentation to auto body shop customers that the body shops had been authorized by plaintiffs to perform the estimates; and (3) alleged misrepresentation to auto body shop customers that the UltraMate version used by Rodríguez produced updated and accurate estimates. (See Docket No. 38, p. 22).

With respect to plaintiffs' first claim, a Lanham Act violation may be based on the defendants' false representation that its goods or services are affiliated or associated with the plaintiff. See Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 132 (2d Cir. 2004). Nevertheless, the "unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation." 4 McCarthy on Trademarks and Unfair Competition § 25:42 (4th Ed.). In this case, plaintiffs have failed to establish by a preponderance of the evidence that Rodríguez, apart from the fact that he made unauthorized use and copies of plaintiffs' software and materials, represented himself to be affiliated with Mitchell or Infotech, or that he was an authorized distributor of the UltraMate program. In fact, the evidence established that Rodríguez did not use plaintiffs' names on his clothing, vehicle or business card when visiting his clients. Moreover, the evidence on record shows that many Mitchell customers cancelled their agreements with Mitchell in order to use the program provided by Rodríguez. This fact, along with the lack of any evidence to the contrary, leads the court to the conclusion that the body shops were not deceived into believing that what they were receiving from Rodríguez was an authorized copy of the Mitchell program. Accordingly, plaintiffs have not established their first Lanham Act claim.

Plaintiffs' second claim - alleging that body shop customers were deceived into believing the

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 17
**Civil No. 03-1031 (GAG/BJM)**

body shops were authorized to use the Mitchell program - fares no better.  Importantly, courts have been reluctant to allow an overlap between claims involving the Lanham Act and copyright law and have dismissed Lanham Act claims where the copyright laws provided an adequate remedy.  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 34 (2003).  Copyright infringement by itself does not amount to a misrepresentation or false designation of origin to establish a claim under Section 43(a) of the Lahnam Act.  Kregos v. Associated Press, 937 F.2d 700, 711 (2d Cir. 1991); Cognotec Servs., Ltd. v. Morgan Guar. Trust Co., 862 F.Supp. 45, 51 (S.D.N.Y. 1994).  Where a plaintiff's Lanham Act claim merely alleges that the defendant made unauthorized use of a copyrighted work, the Lanham Act claim will be dismissed as duplicative of the copyright claim.  Ulloa v. Universal Musical and Video Distribution Corp., 303 F.Supp. 2d 409, 419 (S.D.N.Y. 2004).  Moreover, the "truthful use of an author's name in describing authorship is not a false designation of origin" so long as the author's name is not being used to suggest authorship or approval of a work substantially modified without the author's consent.  Auscape Intern. v. National Geographic Soc., 409 F.Supp. 2d 235, 251 (S.D.N.Y. 2004).  In this case, plaintiffs' claim the body shop customers were deceived appears to be based entirely on the fact that the body shops made illegal use of a copyrighted work to generate the estimates.  As such, the Lanham Act claim is duplicative of the copyright claim.  Accordingly, this claim must be dismissed.

Finally, plaintiffs claim that customers of body shops serviced by Rodríguez were deceived into believing that the UltraMate version that produced their estimates was the most updated and accurate available.  To this end, "[d]istribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement."  Warner-Lambert Co. v. Northside Dev. Co., 86 F.3d 3, 6 (2d Cir. 1996).  To obtain relief for such unauthorized distributions which are not subject to the quality control procedures, the trademark holder must prove that it has established legitimate quality control procedures, that it abides by these procedures, and that the non-conforming sales will diminish the value of the mark.  Id.

**Mitchell International, Inc., et als. v. Luis A. Rodríguez Fraticelli, et als.**  Page 18
**Civil No. 03-1031 (GAG/BJM)**

Here, plaintiffs have established a legitimate quality control procedure in that they provide monthly updates of the UltraMate program to include the most recent cost estimate data available. Therefore, the unauthorized sale of outdated versions of the programs may constitute the sale of a non-conforming product in violation of the Lanham Act. In this case, however, plaintiffs produced little or no evidence that the updates being sold by Rodríguez were not up to date as of the time of his unauthorized sales. Moreover, even assuming that Rodríguez did sell out of date versions of UltraMate, plaintiffs have failed to establish as a matter of fact that any of these sales resulted in any inaccurate estimates or that the value of their trademark was thereby diminished. Accordingly, plaintiffs have failed to meet their burden to establish a claim under the Lanham Act.[3]

### D. The Puerto Rico Law Claims

Plaintiffs also seek recovery under Puerto Rico law based on theories of unfair competition, unjust enrichment and negligence. (See Docket No. 38, p. 26). Plaintiffs' theories for recovery under state law appear to be identical to the theories underlying their federal claims under the Copyright Act and the Lanham Act.

To the extent plaintiffs' state law claims are equivalent to their copyright claims, the state claims are preempted pursuant to section 301 of the Copyright Act. 17 U.S.C. §301; Data General Corp. V. Grumman Systems Support Corp., 36 F.3d 1147 (1st Cir. 1994); Microstrategy, Inc. v. Netsolve, Inc., 368 F.Supp. 2d 533 (E.D.Va. 2005) (software licensor's state law claims for conversion and unjust enrichment against licensee preempted by federal copyright law). Even assuming that some or all of plaintiffs' state law claims are not preempted, I find as a matter of equity that the remedies granted for copyright claims are adequate to compensate the plaintiffs in this case. Accordingly, plaintiffs' state law claims are dismissed.

### CONCLUSION

In sum:

1.      The defendant Luis Rodríguez Fraticelli is found to have willfully infringed

---

[3] Even assuming that plaintiffs had established a claim under the Lanham Act, I find as a matter of equity that the damages awarded for the copyright claims provide an adequate remedy in this case.

Mitchell's copyright in the UltraMate program, and is ordered to pay to Mitchell the amount of $150,000.00 in statutory damages.

　　2.　　Defendant is further ordered to pay to plaintiffs attorneys fees in the amount of $24,975.00, and costs in the amount of $4,177.00;

　　3.　　Defendant Luis Rodríguez Fraticelli is permanently enjoined from infringing or assisting any other person in infringing Mitchell's copyrights in its UltraMate software programs;

　　4.　　Within ten working days of entry of judgment in this case, Rodríguez shall submit all of his computers to inspection by Mitchell's experts to determine whether they contain any of Mitchell's copyrighted programs and materials; if so found, such programs and materials will be deleted from the computers' hard drives.  By the same date, defendant shall deliver to plaintiffs' representatives any and all CDs, manuals or material that contain copies of, or were derived from, Mitchell's copyrighted programs and materials.  Notwithstanding the foregoing, Mitchell and its experts shall ensure that any inspection and examination of defendants' computers shall be limited to a search for the existence of Mitchell's copyrighted programs and materials; no inspection or examination of other files shall be made.

　　5.　　Plaintiffs' claims under the Lanham Act and Puerto Rico law are dismissed with prejudice.

　　Judgement shall be entered accordingly.

　　**IT IS SO ORDERED**.

　　In San Juan, Puerto Rico this 26st day of November, 2007.

　　　　　　　　　　　　　　　　　　　　S/*Bruce J. McGiverin*
　　　　　　　　　　　　　　　　　　　　BRUCE J. McGIVERIN
　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge